UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PAUL G. ABBOTT,

               Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.    C04-5403FDB

REPORT AND
RECOMMENDATION

Noted for July 8, 2005

Plaintiff, Paul G. Abbott, has brought this matter for judicial review of the denial of his application for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation to the Honorable Franklin D. Burgess.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on August 16, 1957. Tr. 272. He has a high school education. Tr. 112. He has

past work experience as a commercial truck driver, food broker, sales representative, and transportation coordinator. Tr. 22, 107, 115, 135.

On June 12, 2000, plaintiff filed applications for disability insurance and SSI benefits, alleging disability as of August 14, 1998, due to various impairments, including daytime somnolence, shortness of breath, fatigue, diabetes, degenerative disc disease/pinched nerve in his back, numbed foot, swollen lower legs/ankles, hypogonadism, and sleep apnea. Tr. 22, 99, 106, 272.  Plaintiff's applications were denied initially and on reconsideration. Tr. 74-79, 81-83, 276-84.

Plaintiff requested a hearing, which was held before an administrative law judge ("ALJ") on July 11, 2002. Tr. 285.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 285-320.  On October 18, 2002, the ALJ found plaintiff not disabled at step five of the disability evaluation process pursuant to 20 C.F.R. Pt. 404, Subpart P, App. 2, § 201.28. See Social Security Administration, Office of Hearings and Appeals Decision, dated October 18, 2002, p. 9, Appendix A to Plaintiff's Opening Brief.[1]

Plaintiff's request for review was granted by the Appeals Council on July 8, 2004. Tr. 1, 34-35.  The Appeals Council vacated the ALJ's decision, and remanded the matter for further consideration of two state physical evaluation reports (completed by plaintiff's treating physician on August 10, 2000 (Tr. 243-44) and May 30, 2002 (Tr. 265-66) respectively) that it found the ALJ had not considered. Tr. 34.  Plaintiff also was given the opportunity to have a further supplemental hearing. Id.

A supplemental hearing was held before a different ALJ on August 7, 2003. Tr. 321.  At that hearing, plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 321-48.  On March 9, 2004, the second ALJ issued a decision, determining that plaintiff was capable of performing other jobs existing in significant numbers in the national economy. Tr. 31-32.  Specifically, the second ALJ found as follows:

> (1)  at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;
>
> (2)  at step two, plaintiff had "severe" impairments consisting of diabetes, hypertension, degenerative disc disease, and sleep apnea;

---

[1]This decision was not included as part of the administrative record.  However, the parties have agreed to supplement the record by including therein the copy of that decision attached to Plaintiff's Opening Brief.  Accordingly, the court also hereby adopts that copy as part of the administrative record in this case.

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform a significant range of light work with an additional limitation on operating motor vehicles and machinery, which precluded him from performing his past relevant work; and

(5)     at step five, plaintiff was capable of performing a significant number of jobs existing in the national economy.

Id.  On July 8, 2004, plaintiff's request for review was denied by the Appeals Council, making the second ALJ's decision the Commissioner's final decision. Tr. 6-8; 20 C.F.R. §§ 404.981, 416.1481.

On July 15, 2004, plaintiff filed a complaint with this court seeking judicial review of the second ALJ's decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)     the ALJ improperly evaluated the medical evidence in the record;

(b)     the ALJ erred in assessing plaintiff's credibility; and

(c)     the ALJ erred in finding plaintiff capable of performing a significant number of jobs in the national economy.

For the reasons set forth below, the undersigned recommends the court affirm the second ALJ's decision.

<u>DISCUSSION</u>

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.      <u>The ALJ Properly Evaluated the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.    Dr. Bateman

Plaintiff argues the ALJ improperly disregarded, and substituted his own opinion for, the opinions of Dr. Michael Bateman, his treating physician, who, plaintiff asserts consistently found he cannot work.  The record contains several state agency physical evaluation forms completed by Dr. Bateman, in which he indicated plaintiff either was "severely limited" (i.e., unable to lift at least two pounds or unable to stand and/or walk) in his ability to perform at least half-time in a day-to-day work setting or would be unable to perform sedentary work at least half-time in a day-to-day work setting for an "indefinite" period of time.[2] Tr. 61-62, 227-28, 243-46, 265-66.

The ALJ provided a lengthy explanation of why he was declining to adopt Dr. Bateman's opinions regarding plaintiff's ability to work, which reads in relevant part:

> The two medical records that the Appeals Council required me to re-examine in this supplemental hearing and this new decision were two Physical Evaluation forms that Dr. Bateman completed on August 10, 2000 and May 30, 2002.  In the first evaluation form of August 10, 2000, . . . [i]n the check box for the level of physical activity the claimant could sustain, Dr. Bateman checked "Severely limited," which is defined as unable to lift at least 2 pounds or unable to stand and/or walk.  The rationale Dr. Bateman gives for this categorization is "Degenerative lumbar spine" with "disc bulge" and decreased range of motion of the spine and "difficulty ambulating" due to radicular pain. . . . It is interesting to note that Dr. Bateman also prepared another such form evaluation on July 28, 1999 in which he checked the box for "Sedentary work," or lifting up to ten pounds and sitting and a certain amount of walking and standing.  At that time the rationale was given as concern for the claimant's lower left foot numbness and "possible lumbar nerve compression." . . . On June 27, 2001, after the form of August 10, 2000, Dr. Bateman prepared an evaluation form in which he also checked the "Sedentary work" box, and merely noted reduced range of motion of the neck and back as the rationale for the conclusion.  He also said that the claimant would be unable to perform at least half-time in a normal job for an "indefinite" period of time . . .
>
> The next evaluation form checked by Dr. Bateman, and the subject of the remand order, is the one of May 30, 2002 in which Dr. Bateman swings back to checking the box for "Severely limited."  The rational this time is stiffness and "poor movement back/spine."  In other notes on the form, Dr. Bateman noted obesity, decreased range of motion of the back and neck, a C6-7 bulge, and right median neuropathy by evaluation . . . On January 15, 2002, Dr. Bateman made a clinic note about the EMG testing with Dr. [Mohammad A.] Saeed showing a diminished nerve conduction of the right medial plantar area, and peripheral neuropathy "probably" due to diabetes. . . . Dr. Saeed's report mentions that the claimant was seen for symptoms of pain and numbness of the right foot, but nothing described as seriously limiting the claimant on his activities or work. . . . The C6-7 bulge noted by Dr. Bateman . . . was reported on the MRI as touching fat only, and not a nerve.  The report also stated that "No impingement upon the existing nerve root identified . . . Medical reports [from Dr. Bateman for the period late July 1999 through

---

[2]The one exception to this is the state agency physical evaluation form Dr. Bateman completed in late July 1999, in which he indicated that plaintiff would be unable to perform sedentary work at least half-time in a day-to-day work setting for only six to twelve months. Tr. 246.

mid-January 2002 (Tr. 223-46) and other medical sources for the period March 2001 through June 2002 (Tr. 247-67)] do not show any significant diminishing of the claimant's range of motion, nor do they show any significant adverse affects from the problems the claimant was having with his right foot.  What is noted is that treatment may give relief, and Dr. Krumins examination of April 2, 2002 found the left foot and ankle to be generally normal.  He noted that the "Sensory exam is unremarkable." . . .

Dr. Bateman prepared another Physical Evaluation form dated June 9, 2003 in which he checked the "Sedentary work" box, although he continued to say that the claimant would be unable to work for an "indefinite" period of time. . . . There are no notes explaining the doctor's conclusions, and treatment notes [from Dr. Bateman for the period September 23, 2002 to June 9, 2003 (Tr. 55-64)] show no significant changes in the claimant's condition or give any objective findings on his back or foot problems.  A range of joint motion chart shows some diminished range of motion on back extension and flexion, in contrast with other findings that claimant could touch the floor bending over, some limitation on lateral back flexion, slight decrease on neck extension and lateral bending, and generally normal range of motion otherwise with some slight differences.  There is nothing in this exhibit that would indicate that the claimant was unable to perform at least at the sedentary level checked by Dr. Bateman, and the contradictory opinion that the claimant was unable to work for an indefinite period of time is not supported by any significant objective evidence . . . As the recitation of the various Physical Evaluation reports filed by Dr. Bateman indicates, there is no rhyme or reason for the inconsistent marking of the functional level from sedentary to severely limited.  The discussions and the physical evidence accompanying the various evaluations do not provide a basis for either of the classifications, but are merely the expressed opinion of Dr. Bateman at the time, and there is nothing in the medical records related to the August 10, 2000 and May 30, 2002 evaluations finding the claimant to be severely limited and the July 28, 1999, June 27, 2001 and June 9, 2003 evaluation[s] finding the claimant only limited to sedentary work that would give a clue to the basis for each opinion.  In other words, the classification of the claimant's functional capacity by Dr. Bateman over the five physical evaluations is contradictory and apparently arbitrary.  It is also instructive to note that Dr. Bateman found the claimant capable of sedentary work at the beginning of his evaluations, in the middle of his examinations, and at the end of the evaluations in mid-2003.  Faced with these inconsistent opinions, the lack of solid objective medical evidence to support any restrictions, and the findings of other examining specialists such as Dr. [Daniel G.] Nehls that indicates the problems experienced by the claimant are not as severe as the claimant makes them seem, I find that Dr. Bateman's opinion that the claimant could not perform work activity or that he was limited to less than sedentary work is not supported by the objective medical evidence. . . . Dr. Bateman's opinion as to the severity of the claimant's musculoskeletal impairments related to his cervical and lumbar spine and the endocrine system impairment related to his right foot and ankle is not consistent with the evidence and assessments of other medical sources, and is even inconsistent itself over time.  The clinical and laboratory signs and findings set forth in the medical record, again as discussed above, do not support an opinion that the claimant could not perform any work or work related activity. The claimant's spine disorders do not approach meeting or equaling the requirements of [any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04], and no physician has given an opinion that this is the case.  The claimant does not have any disorder of the spine, including bulging discs or degenerative disc disease, that results in compromise of a nerve root or the spinal cord.  The imagining test performed show only slight touching of the fatty tissue, and there is only slight reduction of some range of motion, although the claimant can touch his fingers to the ground bending over, there is no significant motor loss in the extremities, and the straight-leg raising test did not reveal any significant limitations.  The claimant can ambulate effectively, as several notes from treating and examining physicians have noted. . . .

1   Under [20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08], Diabetes mellitus, the
2   claimant's impairments resulting apparently from diabetic radiculopathy and numbness in
    the foot is mild compared to the demands of the listing requirements, and there is no
3   opinion or other evidence that even suggests that he meets or equals this listing.  Since
    the opinions of Dr. Bateman, and specifically those contained in the Physical Evaluation
4   reports of August 10, 2000 and May 30, 2002, are not well-supported in the medical
    records and the findings and opinions of other medical sources, and are inconsistent with
5   that medical record and his own opinions given at various times, I do not find his
    opinion that the claimant has less than sedentary functional capacity or that he cannot
6   work to be worthy of controlling weight.  Furthermore, I note that Dr. Bateman is not
    purported to be a specialist in either orthopedic or endocrine medicine, and his opinions
7   about the limits of the weight the claimant could lift and carry, and even his sitting,
    walking and standing ability, are not supported by any objective testing or documented
8   observations.  As noted previously, the record clearly indicates that the claimant can
    ambulate satisfactorily, and he does not use an assistive devise.  He does have numbness
9   in his foot, although the degree of that problem and its severity in terms of loss of
    function is not clear from the record, and Dr. [Shirley] Deem, one of the examining
10  physicians, did not place any standing or walking limitations on the claimant.  She only
    opined that he would have difficulty sitting for a full six hours with normal breaks
11  because of his lumbar disc disease, but there were not tests to support this concern, and
    it appeared to be more speculation than fact. . . . I also note that the problems related to
12  his lumbar spine do not feature prominently in later evaluations, as the focus is on the
    sleep apnea and the diabetic neuropathy.  There is nothing in the evaluations of
13  specialists such as Dr. Nehls to support a finding that the degenerative disc disease
    rendered the claimant unable to do a wide range of activity, and in fact, according to the
14  record on his activities of daily living, he is active.

15  For all of these reasons, I do not find the opinions of Dr. Bateman that relegate the
    claimant to less than sedentary functional capacity to carry much weight.  Of his five
16  Physical Evaluation reports, three find that the claimant can lift and carry at the
    sedentary level, while only two place more strict limits.  His conclusions that even with
17  this sedentary capacity the claimant could not perform work are not supported by his
    own clinical findings or the medical evaluations of other physicians.

18  Tr. 25-28.  These findings are well supported by the substantial evidence in the record.

19          Plaintiff argues there is no medical evidence in the record contradicting Dr. Batemen's opinions that

20  he is unable to perform any work.  As noted by the ALJ, however, Dr. Bateman's own diagnostic notes

21  provide little support for those opinions.  While plaintiff did report feelings of numbness and decreased

22  sensation in his right foot in early to mid-1999, no objective medical findings concerning any functional

23  limitations relating to that condition were noted. Tr. 176, 178-80.  Indeed, in late April 1999, Dr. Bateman

24  found plaintiff had "[n]o demonstrable weakness" or "any other neurologic symptoms." Tr. 180.  Although

25  plaintiff had some right ankle and foot swelling, he had "no proximal pain" or calf tenderness. Id.  Plaintiff

26  did have swelling in early May 1999, however, that apparently had improved and there was "[n]o severe

27  pitting edema." Tr. 179.  His strength was noted to be intact in late July 1999. Tr. 176.

28          In late April 2000, furthermore, Dr. Bateman encouraged plaintiff to start exercising "a minimum of

three days per week for thirty minutes of aerobic exercise." Tr. 170.  In early March 2001, he noted that plaintiff was "going about his normal duties," and told him to continue his "daily walking program." Tr. 235.  In response to plaintiff's report of right ankle tenderness in late June 2001, Dr. Bateman "gave him some exercises to do at home." Tr. 226.

In mid-January 2002, Dr. Bateman did note that electrodiagnostic testing showed plaintiff had "diminished nerve conduction" in his right foot. Tr. 253.  Again, however, no reference to any functional limitations was made.  In mid-July 2002, while plaintiff reported experiencing ankle pain, he also stated that he had been exercising. Tr. 225.  Dr. Bateman further found plaintiff had no major edema and "good range of motion." Id.  He recommended that plaintiff walk on level surfaces. Id.

With respect to plaintiff's back problems, Dr. Bateman reported in early July 1999, that plaintiff was limited in his extension and somewhat limited in his flexion. Tr. 176.  Nevertheless, his strength was deemed to be intact. Id.  As discussed above, Dr. Bateman encouraged plaintiff to engage in a program of aerobic exercise in late April 2000, and to walk on a daily basis in early March 2001. Tr. 170, 235.  In early March 2001, plaintiff reported neck stiffness and left arm pain and weakness. Tr. 235.  While he could not extend his neck "without causing pain" or discomfort, and he was able to flex his neck forward and had no muscle atrophy. Id.  In mid-March 2001, while plaintiff still complained of left arm pain and weakness, he reported that it was "not as intense as it was," and that he could flex, extend, bend and rotate his neck "fairly well." Tr. 233.  In terms of his sleep apnea, again there is little objective medical evidence in Dr. Bateman's notes concerning limitations stemming from that condition.  In addition, as discussed below, plaintiff has not been compliant with respect to proper use of his C-PAP machine.

Plaintiff also has been diagnosed with diabetes.  With respect to that too, however, Dr. Bateman's notes fail to indicate any significant functional limitation. Tr. 168, 225, 231, 235, 242.  In late September 2001, plaintiff told Dr. Bateman that he was working on dietary issues and that he was "feeling better." Tr. 168.  As a result of those efforts, his blood sugars, while still elevated, were found to be "in a much more manageable range" in early December 2000. Tr. 238.  In addition, plaintiff was noted to not have "had any foot ulcers or major visual changes." Id.  Dr. Bateman did diagnose plaintiff with "peripheral neuropathy probably due to his diabetes" in mid-January 2002. Tr. 253.  However, that report contained no indication as to how this restricted plaintiff's ability to function.

1   The objective findings from other medical sources in the record also fail to support the opinions of

2   Dr. Bateman regarding plaintiff's inability to work.  In early December 2000, Dr. Shirley Deem noted that

3   plaintiff was not taking any medication for his diabetes, and felt that he was managing his diabetes well. Tr.

4   192-93, 195.  Plaintiff's chest and lungs were clear throughout. Tr. 193.  Plaintiff was able to "balance

5   without difficulty," and "reach over and touch the floor with his fingers." Id.  He had "full extension and

6   rotation," and his straight leg raising was "done very well." Tr. 193-94.  He was able to flex and straighten

7   his legs "without any difficulty," and he had normal grip strength. Tr. 194.  His sensory examination was

8   intact, except for some loss of sensation in his right foot. Id.

9   Also in early December 2000, Dr. Mohammad A. Saeed found that plaintiff did have an abnormal

10  nerve conduction study of his right foot compatible with neuropathy "involving both lower extremities,

11  probably secondary to diabetes mellitus." Tr. 220.  However, while he suggested "a podiatry or orthopedic

12  consultation and trial of a local injection" might be "worthwhile," he too did not indicate plaintiff had any

13  functional limitations. Id.

14  Plaintiff saw Dr. Daniel G. Nehls in mid-May 2001 for neck and left shoulder and arm pain.  He

15  denied any weakness, however, and told Dr. Nehls that the pain had "almost completely resolved" over the

16  prior several weeks, and that he was "almost pain free." Tr. 207.  Dr. Nehls noted that plaintiff walked with

17  a normal gait and had "full range of motion" in his cervical spine. Tr. 208.  His neurological examination

18  was essentially intact, with normal muscle tone, strength and bulk. Id.  He had normal sensation to light

19  touch, and his lungs were mostly clear. Id.  While electrodiagnostic testing revealed degenerative disc

20  changes in plaintiff's cervical spine with left-sided radiculopathy, Dr. Nehls told plaintiff that he should

21  "gradually increase his activities," with the exception that he limit "overhead work and lifting." Id.

22  Plaintiff was examined by a Dr. Krumins in early April 2002, for a complaint of right foot and ankle

23  numbness. Tr. 247.  There was no obvious swelling, however, and plaintiff's sensory examination was

24  "unremarkable." Id.  Radiographic examination of the ankle also was unremarkable. Id.  Although a further

25  examination performed a week later revealed decreased foot sensation, the skin was intact, and there was no

26  redness or warmth. Tr. 247-48.

27  In addition, neither of the non-examining consulting physicians in the record found plaintiff to have a

28  disabling impairment.  Dr. Robert G. Hoskins opined that plaintiff would be capable of performing light

1    work, albeit with certain postural limitations and limitations on his ability to push and/or pull repetitively

2    with his right lower extremity. Tr. 197-200.  Dr. Robert Bigley, the medical expert who testified at the first

3    administrative hearing, noted that none of plaintiff's alleged impairments met or equaled any of those listed

4    in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 312-14.  Thus, while it is true that, with the exception of

5    Dr. Hoskins, none of the other physicians in the record specifically stated that plaintiff was able to work,

6    their diagnostic findings and reports do not support Dr. Bateman's disability opinions, and, thus, as such

7    they do contradict them.

8         The ALJ also did not err in finding Dr. Bateman's opinions regarding plaintiff's ability to work that

9    are contained in the five state physical evaluation forms he completed to be inconsistent.  As noted by the

10   ALJ, Dr. Bateman provided contradictory opinions in late June 2001, and early June 2003, that although

11   plaintiff was able to perform sedentary work at least half-time, he would not be able to do so indefinitely.

12   Tr. 26, 62, 228.  These opinions also are inconsistent with the two intervening late August 2000 and late

13   May 2002 opinions of Dr. Bateman that plaintiff was severely limited (i.e., unable to lift at least two pounds

14   or stand and/or walk) in his ability to perform at least half-time work. Tr. 26, 244, 266.  Plaintiff

15   nevertheless argues that the ALJ misunderstood the state physical evaluation forms, and that, if correctly

16   read, those forms all show he is unable to perform even sedentary work and thus is disabled.

17        It is true one could read the state physical evaluation forms in the manner plaintiff proposes, and find

18   the controlling portion of those forms to be that concerning how long it is estimated the claimant will be

19   unable to perform at least half-time in a normal day-to-day work setting.  However, it also is equally

20   plausible to give controlling weight to the question which asks for the level of work the claimant is able to

21   perform.  In other words, it is not exactly clear how the state evaluation form is intended to be interpreted.

22   Because it is the ALJ's sole responsibility to resolve conflicts and ambiguities in the medical evidence, the

23   court cannot fault the ALJ for choosing the latter interpretation, and thereby finding the opinions of Dr.

24   Bateman contained in those forms to be inconsistent. Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.

25   In any event, as discussed above, the substantial evidence in the record does not support Dr. Bateman's

26   opinions that plaintiff is unable to perform even sedentary work.

27        B.    Dr. Deem

28        Plaintiff also argues the ALJ erred by improperly substituting his opinion for that of Dr. Shirley

Deem.  In early December 2000, Dr. Deem diagnosed plaintiff with "[p]robable lumbar disc disease with

some possible nerve root impingement," diabetes, hypertension, sleep apnea, and hypogonadism. Tr. 194-

95.  She also provided a functional assessment of plaintiff, which reads in relevant part:

> I believe that the claimant could function with these limitations for a two-hour work
> period.
>
> He could lift and carry 20 pounds occasionally, 10 pounds intermittently, and 5 pounds
> frequently for the two-hour period of time.
>
> I believe that he would have difficulty sitting for a full six hours with normal breaks
> because of his lumbar disc disease involving the right leg and his lower back.

Tr. 195.  With respect to this assessment, the ALJ found as follows:

> [Dr. Deem] recounted that the claimant had been suffering from back pain since 1996
> when he was unloading trucks and developed back pain that inhibited his ability to lift
> and carry.  He also said that he began to suffer from numbness in his foot and swollen
> ankles in 1999.  Dr. Deem diagnosed the claimant with "probable" lumbar disc disease
> with some "possible" nerve root impingement involving the right L-4-L5 nerve root.
> Even though the claimant was said to have some limitations due to his lumbar disc
> disease, Dr. Deem opined that he could lift and carry 20 pounds occasionally, 10 pounds
> intermittently and 5 pounds frequently "for the two-hour period of time."  No standing
> and/or walking limitations were imposed.  Sitting for a full six hours with normal breaks
> was believed to be difficult because of the lumbar disc disease involving his right leg and
> lower back, although there is not much evidence of significant problems with these areas
> aside from the complaints of the claimant.  She noted that the claimant could bend over
> and touch the floor with his fingers, had no problems with straight leg raising, and
> generally good range of motion.  He had some loss of sensation on the sole of his right
> foot, with no report of problems with the left foot. . . . The prior decision adequately
> covered the reasons why Dr. Deem's conclusions were not worthy of being accorded
> much weight, and she is a non-treating medical source.  Essentially, the record from
> other examiners and her own notations are not consistent with her opinion that the
> claimant was limited to lifting and carrying only 5 pounds frequently, or that the claimant
> could only function with these limitations for a two-hour period.  As the prior decision
> noted, the claimant at the time reported that she [sic] took care of all her [sic] personal
> needs, grocery shopping, laundry, housework and was able to use public transportation.
> . . . He could ambulate normally and had a full range of motion in his back.  Dr. Deem's
> conclusions appear based more on what the claimant told her than the objective
> observations and measurements of the claimant's abilities.  The discounting of Dr.
> Deem's opinion was not challenged in the Appeals Council remand order, and I do not
> accord it much weight.

Tr. 24-25.  Again, these findings are supported by the substantial evidence in the record.

As discussed above, the objective medical findings contained in the physical examination portion of

Dr. Deem's December 2000 evaluation of plaintiff were largely unremarkable. Tr. 192-95.  In addition, also

as discussed above, the other objective medical evidence in the record, including the diagnostic notes from

Dr. Bateman, does not support a finding that plaintiff is unable to perform even sedentary work. See Tr.

168, 170, 174-76, 178-80, 197-200, 207-08, 220, 225-26, 231, 233, 235, 238, 242, 247-48, 253, 312-14.

1  Indeed, Dr. Hoskins felt that there was "no other evidence" in the record to substantiate Dr. Deem's

2  opinion that plaintiff was unable to sit for six hours in a day. Tr. 202.

3      The limitations Dr. Deem found concerning plaintiff's ability to lift and carry and sit thus do appear

4  to be based more on plaintiff's own self-reporting rather than on objective medical findings.  Because, as

5  explained below, the ALJ properly discounted plaintiff's credibility, the ALJ also did not err in rejecting Dr.

6  Deem's opinion. Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's

7  symptom complaints when record supports ALJ in discounting those complaints); Morgan, 169 F.3d at 601;

8  (physician's opinion premised to large extent on claimant's complaints may be disregarded where those

9  complaints have been properly discounted).

10  II.     The ALJ Properly Assessed Plaintiff's Credibility

11      Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

12  639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

13  F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

14  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

15  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

16  as that determination is supported by substantial evidence.  Tonapetyan, 242 F.3d at 1148.

17      To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

18  disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

19  and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12

20  F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's

21  reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The

22  evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th

23  Cir. 2003).

24      In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

25  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

26  testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

27  also may consider a claimant's work record and observations of physicians and other third parties regarding

28  the nature, onset, duration, and frequency of symptoms. Id.

Plaintiff argues the ALJ's assessment of his credibility is flawed, because the ALJ does not set forth with any specificity his reasons for not finding him fully credible.  A plain reading of the ALJ's decision, however, indicates that this clearly is not the case.  Thus, for example, the ALJ discounted plaintiff's credibility in part because his allegations of disabling limitations are not supported by the medical evidence in the record. Tr. 28-29.  A finding that a claimant's symptom complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  As discussed above, the ALJ properly evaluated the medical evidence in the record, which does not support a finding that plaintiff cannot do even sedentary work.  The ALJ thus did not err in discounting plaintiff's credibility for this reason.

The ALJ also discounted plaintiff's credibility in part because he was able to do his activities of daily living, including "simple chores around the house such as his laundry, dishes and grocery shopping." Tr. 28. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if he or she "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues that the level at which he is able to do his activities of daily living do not support a finding that he is capable of working.  While plaintiff testified he had trouble completing his activities of daily living in a timely manner (Tr. 301, 333-34), he previously has reported being capable of performing various household tasks and lifting anything weighing up to eighty to one hundred pounds. Tr. 124, 145. Dr. Hoskins also noted that plaintiff described "the ability to perform light activities" in his activities of daily living, albeit without indicating how long he could do so. Tr. 201.

As noted above, furthermore, Dr. Bateman on two occasions encouraged plaintiff to walk daily and engage in a program of aerobic exercise. Tr. 170, 235.  In early March 2001, plaintiff reported that he was "going about his normal duties," and Dr. Bateman thought plaintiff "had been to the horse races." Tr. 235. Thus, although the record may not show plaintiff to be especially vigorous in his activities of daily living, the ALJ did not err in discounting plaintiff's credibility in part for this reason.

In addition, the ALJ further discounted plaintiff's credibility for not following through with proper

medical treatment. Tr. 28.  The failure to assert a good reason for not seeking, or following a prescribed

course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity

of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  On the other hand, if

the claimant provides evidence of a good reason for not taking medication, his symptom testimony cannot

be rejected because she failed to do so. Smolen, 80 F.3d at 1284.  Specifically, the ALJ found as follows:

> The claimant says that he experiences fatigue and falls asleep during the day because of the
> sleep apnea.  He is, however, being treated with a C-PAP machine for his sleep apnea, and
> there are no objective reports that verify his claims that it is not as effective as it should be.
> He has not sought any changes in his medical treatment for this condition.

Tr. 28.  The undersigned finds this to be a valid reason for discounting plaintiff's credibility as well.

In early October 1999, in response to plaintiff's reported difficulty tolerating the C-PAP machine,

Dr. Bateman suggested certain changes in its use that could be done. Tr. 174.  In early December 2000, Dr.

Bateman again noted plaintiff was having problems with his C-PAP machine, although there is no indication

in the record that the changes previously recommended by Dr. Bateman had been pursued. Tr. 238.  This

time, Dr. Bateman wrote a note that plaintiff could "take to the medical equipment supply place to have his

machine assessed" and have it "titrated to comfort." Id.  Again, however, there is no indication in the record

that plaintiff followed through on this recommendation. See Tr. 298-300, 337.  As noted by Dr. Bigley, the

medical expert, if plaintiff was having trouble with his C-PAP machine, the proper thing to do would be to

have the machine examined and to seek help in how to properly use it. Tr. 314-16.  This the plaintiff

apparently did not do.

III.     The ALJ Properly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

process the ALJ must show there are a significant number of jobs in the national economy the claimant is

able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ

can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (because ALJ included all limitations that he found to exist, and those findings were supported by substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

Plaintiff argues the ALJ disregarded a variety of non-exertional impairments in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy, including leg pain when sitting or standing for lengths of time, fatigue and daytime somnolence.  As discussed above, however, the ALJ properly evaluated the medical evidence in the record and plaintiff's own testimony, and thus also properly found he had no disabling impairments.  To the extent plaintiff had any limitations from leg pain, the ALJ's finding that he is limited to performing light work would appear to adequately account for such limitations based on the medical evidence in the record.

With respect to plaintiff's allegations of fatigue and daytime somnolence, also as discussed above, the ALJ properly discounted his testimony due to his failure to pursue Dr. Bateman's recommendations regarding the C-PAP machine.  As to the testimony of the medical expert, while Dr. Bigley did testify that daytime somnolence can be caused by sleep apnea and that plaintiff has had problems with his C-PAP machine, he also specifically testified that the proper thing for plaintiff to do in that case would be to seek appropriate help from medical professionals. Tr. 314-16.  As discussed above, however, the evidence in the record indicates that plaintiff failed to do so.  In any event, the ALJ did limit plaintiff to work not involving driving or operating machinery because of his alleged problems with sleep apnea. Tr. 29.  Accordingly, the ALJ did not err in finding plaintiff not disabled at step five of the disability evaluation process.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 8, 2005**, as noted in the caption.

DATED this 17th day of June, 2005.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 16